**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
SEURANINE PERSAD,                          :
                                           :          **REPORT AND**
                          Petitioner,      :          **RECOMMENDATION**
                                           :
         -against-                         :          **05-CV-4199 (CBA)**
                                           :
**JAMES CONWAY**, Warden, Attica Correctional :
Facility,                                  :
                                           :
                          Respondent.      :
-------------------------------------------------------------x
**GOLD, S., U.S.M.J.:**

## INTRODUCTION

On January 10, 2001, following a jury trial in New York Supreme Court, Queens County,

Seuranine Persad was found guilty of Assault in the First Degree, N.Y. Penal Law § 120.10;

Criminal Possession of a Weapon in the Second Degree, N.Y. Penal Law § 265.03; and Criminal

Possession of a Weapon in the Third Degree, N.Y. Penal Law § 265.02.[1]  Resp. Mem. p. 1.[2]

Persad was acquitted on a charge of Attempted Murder in the Second Degree, N.Y. Penal Law

§ 110/125.25, and on a second charge of Assault in the First Degree, N.Y. Penal Law § 120.10.

*Id*. at 9.  Persad's conviction arose from the shooting of Christopher Psyllos as he sat in a car

during the early-morning hours of April 16, 1999.  *Id*. at 2.  Psyllos was shot in the face and

---

[1] In the state court proceedings, petitioner's first name was spelled various ways.  *See*,
*e.g.*, *People v. Persad*, 760 N.Y.S.2d 673, 306 A.D.2d 359 (2d Dep't 2003).  Although the case
caption on the docket sheet spells petitioner's name as Seruanine and some papers from the state
court proceedings spell it as Surnarine, petitioner's papers indicate that his name is spelled
Seuranine.  This Report and Recommendation will use the latter spelling.  *See* Petition for Writ
of Habeas Corpus ("Habeas Pet."), Docket Entry 1; Petitioner's Memorandum and Legal
Arguments in Support of Petition for a Writ of Habeas Corpus ("Pet. Mem."), Docket Entry 3.

[2] "Resp. Mem." refers to Respondent's Memorandum of Law in Opposition to Petition
for a Writ of Habeas Corpus, submitted February 17, 2006, Docket Entry 8.

suffered severe, permanent injuries to his right eye and face. *Id.* Persad was sentenced as a predicate felon to concurrent terms of twenty-five years on the assault charge, ten years on the second-degree weapons count, and six years on the third-degree weapons count. *Id.* at 1.

Persad has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction on six grounds: 1) denial of his right to counsel of choice, 2) denial of his right to be present at side bar conferences, 3) denial of his right to present a defense, 4) prosecutorial misconduct in the summation, 5) prosecutor's use of false testimony, and 6) ineffective assistance of counsel. The Honorable Carol Bagley Amon has referred the petition to me for report and recommendation. Docket Entry 11. For the reasons stated below, I respectfully recommend that Persad's petition be denied.

## THE TRIAL

The prosecution's case against Persad included the testimony of the shooting victim and an eyewitness to the shooting identifying Persad as the shooter, the testimony of two individuals acquainted with Persad who stated they saw Persad with a gun on the night of the shooting, and a post-arrest statement by Persad himself admitting his involvement. No physical evidence linking Persad to the crime was introduced at trial.

Christopher Psyllos, the victim, identified Persad at trial as the man who shot him. Psyllos described sitting with his friend, Thomas Kennedy, in Kennedy's red car, when a group of three men passed by. Tr. 722-23, 726.[3] After an exchange of stares, one of the men walked up to the car, pulled a gun, and shot Psyllos in the head. Tr. 729-32. Psyllos was rushed to the hospital, where he was held for several days and treated for severe injuries. Tr. 733 *et seq.*

---

[3] "Tr." refers to the transcript of Persad's state court trial.

During the trial, Psyllos pointed out Persad and identified him as the shooter. Tr. 735. Psyllos further testified that, shortly after the shooting, he realized that he recognized Persad as someone he had seen in a bar and who went by the name of Ken. Tr. 749. Psyllos acknowledged on cross-examination that he was visited by detectives shortly after being released from the hospital, but did not tell the officers that he remembered seeing Persad before the night of the shooting. Tr. 791. Psyllos also acknowledged that the detectives showed him a photo spread that included Persad's picture, but that he did not identify Persad's photograph. Tr. 789-90. About nine months later, however, in January 2000, another detective showed Psyllos the same photo spread, and on this occasion Psyllos did identify Persad as the shooter and did tell the detective he recognized Persad as someone he knew by the name of Ken. Tr. 759-60, 802-03.

Thomas Kennedy, Psyllos' friend, described the events leading up to the shooting essentially as Psyllos had. Like Psyllos, Kennedy identified Persad during the trial as the shooter. Tr. 822, 834. Also like Psyllos, Kennedy was shown a photo spread shortly after the shooting but did not identify any of the photographs as depicting the man who shot Psyllos. Tr. 830, 833.

David Gonzalez testified that he and Persad were together on the night of the shooting. Tr. 669. Gonzalez testified that Persad was drunk and had been waving a gun in the air earlier that night. Tr. 673, 697. Later, while waiting for Persad outside a bar near where Psyllos and Kennedy were parked, Gonzalez saw Persad walking toward him; then, while his back was turned, Gonzalez heard a shot, turned around, and saw Persad standing beside a red car. Tr. 674. Persad then jumped into Gonzalez' car, and Gonzalez quickly drove Persad home. Tr. 674.

Richard Errico, who worked at a bar visited by Persad and Gonzalez on the night of the shooting, testified that he saw Kenny – the name he knew Persad by – on the night of the

shooting, and saw Kenny with what he thought was a gun. Tr. 918-19. Finally, Detective Lewis Lilla interviewed Persad after he was arrested and testified that Persad confessed to the shooting orally and in a written statement. Tr. 857, 862.[4]

Petitioner's defense at trial was misidentification. Persad called Michael Meenan, a detective who interviewed Psyllos, who testified that he showed Psyllos a photo spread about two weeks after the shooting, but that Psyllos failed to identify any of the six photographs as a picture of his assailant. Tr. 906. The trial judge, sustaining a hearsay objection, precluded Meenan from testifying that Psyllos also told him that he had never seen the shooter before, which contradicted Psyllos' testimony that he knew Persad, albeit only vaguely, from a local bar. Tr. 904-05.

Persad also testified in his own defense, and denied shooting Psyllos. Tr. 950. Persad acknowledged that he confessed to the shooting to Detective Lilla, but said he did so only in response to threats and pressure by the police. Tr. 964. Finally, Persad admitted that he left town just after learning that police officers wanted to talk to him about the shooting, even though by doing so he violated the terms of a probationary sentence he was serving at the time. Tr. 970-73.

## STATE COURT PROCEDURAL HISTORY

Persad's conviction was affirmed by the Appellate Division, Second Department, on June 9, 2003. *People v. Persad*, 760 N.Y.S.2d 673, 306 A.D.2d 359 (2d Dep't 2003). On September 30, 2003, the Court of Appeals denied leave to appeal. *People v. Persad*, 100 N.Y.2d 623, 767 N.Y.S.2d 407, 799 N.E.2d 630 (2003). Reconsideration was denied on May 11, 2004. 2 N.Y.3d

---

[4] The prosecution's other witnesses were a police officer who responded to the hospital where Psyllos was being treated and then went to the location where the shooting occurred, a second officer who collected evidence at the crime scene, and a doctor who treated Psyllos' eye injuries.

804, 781 N.Y.S.2d 303, 814 N.E.2d 475 (2004).  Persad then filed a Writ of Error Coram Nobis,

which was denied on October 18, 2004.  11 A.D.3d 640, 782 N.Y.S.2d 683 (2d Dept't 2004).

The Court of Appeals denied leave to appeal the Writ on December 21, 2004.  4 N.Y.3d 747, 790

N.Y.S.2d 659, 824 N.E.2d 60 (2004).

## PROCEDURAL REQUIREMENTS AND LEGAL STANDARDS

This court's review of Persad's petition is governed by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA").  28 U.S.C. § 2244.

### A.      Statute of Limitations

Persad has filed his petition within the one-year limitations period set by Congress in

AEDPA.  *See* 28 U.S.C. § 2244(d)(1).  A conviction becomes final when the ninety-day period

following final state court review for filing a petition for a writ of certiorari to the United States

Supreme Court has expired.  *McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003).  Persad's

ninety-day period expired on August 9, 2004, and he did not file his petition with this court until

September 2, 2005, more than one year later.  Resp. Mem. p. 13.  Under AEDPA, however, the

limitations period is tolled during the pendency of a post-conviction application for collateral

review.  28 U.S.C. § 2244(d)(2).  Persad applied for a Writ of Error Coram Nobis on May 31,

2004, and that application was not finally decided until the Court of Appeals denied leave to

appeal on December 21, 2004.  Persad's time to file a habeas petition was thus extended by seven

months from August, 2005 to March, 2006.  Accordingly, Persad's petition is timely.

### B.      Exhaustion

Under AEDPA, petitioners for habeas relief who are serving state sentences must first

exhaust all available state court remedies.  28 U.S.C. § 2254(b); *Baldwin v. Reese*, 541 U.S. 27,

124 S. Ct. 1347 (2004).

> State remedies are deemed exhausted when a petitioner has: (i)
> presented the federal constitutional claim asserted in the petition to
> the highest state court (after preserving it as required by state law
> in the lower courts) and (ii) informed that court (and lower courts)
> about both the factual and legal bases for the federal claim.

*Ramirez v. Attorney General of New York*, 280 F.3d 87, 94 (2d Cir. 2001). In *Baldwin*, the

Supreme Court held that "a state prisoner does not 'fairly present' a claim to a state court if that

court must read beyond a petition or a brief (or a similar document) that does not alert it to the

presence of a federal claim in order to find material . . . that does so." 541 U.S. at 32, 124 S. Ct.

at 1351.

In this case, Persad originally presented a "mixed petition," i.e., a habeas petition with

exhausted and unexhausted claims. When confronted with a mixed petition, a court may stay the

case while the petitioner exhausts his state court remedies, allow the petitioner to amend the

petition to remove the unexhausted claims, or deny the petition on the merits. *See* 28 U.S.C.

§ 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

state."). *See also Rhines v. Weber*, 544 U.S. 269, 125 S. Ct. 1528 (2005); *Zarvela v. Artuz*, 254

F.3d 374 (2d Cir. 2001). However, after a conference held on March 28, 2007, Persad, who is

represented by counsel, submitted a stipulation withdrawing his unexhausted claims: 1) the

prosecution's use of false testimony and 2) ineffective assistance of trial and appellate counsel on

the grounds that they a) failed to object or appeal on the grounds that the prosecutor presented

false testimony and b) failed to move to set aside the verdict as inconsistent or appeal on that

basis. *See* Stipulation, Docket Entry 15.

Petitioner has properly exhausted his five remaining claims: 1) denial of his right to counsel of choice, 2) denial of his right to be present at side bar conferences, 3) denial of his right to present a defense, 4) prosecutorial misconduct in the summation, and 5) ineffective assistance of trial counsel on the grounds that counsel a) failed to object and prepare for Errico's testimony, b) elicited testimony of a prior identification, c) failed to object sufficiently to the prosecutor's summation, and d) failed to object to the jury charge and allowed improper bolstering testimony. Chaffee Decl. Exs. A, C.[5]  Petitioner presented these claims in his counseled and *pro se* briefs to the Appellate Division and the Court of Appeals.

## C.   Legal Standard

Pursuant to AEDPA's deferential standard, a federal court may not grant a writ of habeas corpus to a state prisoner on a claim that was adjudicated on the merits in state court

> unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Price v. Vincent*, 538 U.S. 634, 639-40, 123 S. Ct. 1848, 1852-53 (2003).  Thus, under AEDPA, a federal habeas court may not issue a writ simply because it decides that the state court applied Supreme Court precedent incorrectly.  *Price*, 538 U.S. at 641, 123 S. Ct. at 1853.  Rather,

> [u]nder the "contrary to" clause, a federal habeas court may grant the writ [only] if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

---

[5] "Chaffee Decl." refers to the Declaration of Chelsea Chaffee in Opposition to Petition for Writ of Habeas Corpus, Docket Entry 7.

> state court decides a case differently than [the Supreme] Court has
> on a set of materially indistinguishable facts. Under the
> "unreasonable application" clause, a federal habeas court may
> grant the writ if the state court identifies the correct governing legal
> principle from [the Supreme] Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000). *See also Henry v. Poole*, 409 F.3d 48, 67-68 (2d Cir. 2005). In the Second Circuit, "it is well-established . . . that the objectively unreasonable standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." *Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir. 2003) (internal quotation marks omitted). *See also Lainfiesta v. Artuz*, 253 F.3d 151, 155 (2d Cir. 2001).

## PETITIONER'S CLAIMS FOR HABEAS RELIEF

### A.      Right to Counsel of Choice

Petitioner first seeks habeas relief on the ground that the denial of his request for an adjournment of the trial to retain new counsel violated his right to be defended by counsel of his choice. Habeas Pet. Ground 1.[6] Persad's claim should be rejected because he did not seek an adjournment until jury selection was about to begin.

As the court was about to call a jury panel into the courtroom, Randall Unger, petitioner's court-appointed counsel, reported having learned during the morning recess that Persad's family was attempting to retain a private attorney to defend Persad at trial. Tr. 23. The private attorney, Steven Brill, had represented Persad in prior criminal cases. Tr. 23. Mr. Unger conveyed to the court that, according to Persad's girlfriend, Mr. Brill had not yet been retained, but Persad's

---

[6] "Habeas Pet." refers to Petition for Writ of Habeas Corpus, Docket Entry 1.

family had recently called Mr. Brill's office and was gathering the funds to retain him. Tr. 23-24. The court concluded that Persad's adjournment request appeared to be a "ploy to delay" the trial and denied the application. Tr. 26. The court noted that Persad had taken no steps to retain Mr. Brill for months, and first asked for time to do so as jury selection was about to begin. Tr. 27. In response, Mr. Unger noted that Persad had been incarcerated and therefore relied upon his family to take the necessary steps to retain Mr. Brill. Tr. 27. The court denied Persad's application, reiterating that it appeared to be a delaying tactic, and remarked that "Mr. Unger is a very fine and experienced attorney who has a wonderful reputation. He's an excellent lawyer and you're very lucky to have him, I'll tell you that right now." Tr. 27-28.

Petitioner's claim was rejected by the Appellate Division, which held that "[t]he [New York] Supreme Court providently exercised its discretion in denying the defendant's request, made on the eve of trial . . . [because] defendant was afforded a reasonable opportunity to retain counsel of his own choosing before trial." *Persad*, 760 N.Y.S.2d at 674, 306 A.D.2d at 359. The Appellate Division's decision was neither contrary to nor an unreasonable application of clearly established federal law.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. AMEND VI. This right applies to the states through the Fourteenth Amendment, *Gideon v. Wainwright*, 372 U.S. 335, 341-44, 83 S. Ct. 792, 794-97 (1963), and encompasses a defendant's *qualified* right to choose his counsel. *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 1697 (1988). In *U.S. v. Gonzalez-Lopez*, __ U.S. __, __, 126 S. Ct. 2557, 2565-66 (2006), the Supreme Court reiterated that the right to choose particular counsel is not absolute, holding that a trial court

retains "wide latitude in balancing the right to counsel of choice . . . against the demands of its calendar." *See also Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 1616 (1983) ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.") (internal quotation marks and citation omitted). Thus, the right to counsel of one's choice may be circumscribed when it impinges upon other fundamental rights or "interfere[s] with the fair administration of justice." *McKee v. Harris*, 649 F.2d 927, 931 (2d Cir. 1981) (internal quotation marks and citation omitted).

> [W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat*, 486 U.S. at 159, 108 S. Ct. at 1697.

Accordingly, a belated request for substitution of counsel, such as an application made in the midst of trial, should generally be denied unless a defendant can show "good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *McKee*, 649 F.2d at 931 (internal quotation marks and citation omitted). *See also U.S. v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997) ("On the eve of trial, . . . a defendant can only substitute new counsel when unusual circumstances are found to exist, such as a complete breakdown of communication or an irreconcilable conflict."); *U.S. v. Llanes*, 374 F.2d 712, 717 (2d Cir. 1967) ("Judges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay."). In determining when a denial of an adjournment request violates a constitutional right,

> [t]here are no mechanical tests for deciding when a denial of a
> continuance is so arbitrary as to violate due process. The answer
> must be found in the circumstances present in every case,
> particularly in the reasons presented to the trial judge at the time
> the request is denied.

*Grotto v. Herbert,* 316 F.3d 198, 206 (2d Cir. 2003).

Here, the trial court's denial of Persad's request to adjourn the trial was not "so arbitrary as to violate due process." Rather, the trial court's decision was reasonable in light of Persad's delay in attempting to retain new counsel or requesting an adjournment of his trial to do so. Indeed, had Persad's request, made only moments before a jury panel entered the courtroom, been granted, the "fair administration of justice" would have been impeded. *See Anderson v. Walker*, 1998 WL 661466, at *3 (E.D.N.Y. Aug. 6, 1998). Moreover, petitioner failed to establish any good cause for his application; Persad did not assert, for example, any concern about his trial counsel's abilities or any conflict with counsel that would have prevented Unger from providing an effective defense at trial.[7] Rather, Persad's request for an adjournment to obtain counsel who represented him previously seems to have been based merely on Persad's personal preference, which is an insufficient justification for delaying the start of a trial. *See Wheat*, 486 U.S. at 159, 108 S. Ct. at 1697. Under these circumstances, the trial court's ruling and Appellate Division's decision were not contrary to or an unreasonable application of clearly established law. Therefore, this ground for habeas relief should be rejected.

---

[7] The trial court made very little inquiry as to the reasons for Persad's request and did not explicitly explain the consequences of any adjournment. Tr. 23-28. At least where the defendant raises a substantial complaint about counsel, it is prudent for a court to inquire about the length of any requested delay, discuss whether there were prior adjournments, and explain what prejudice would result if an adjournment were granted. *See McKee*, 649 F.2d at 933; *Childs v. Herbert*, 146 F. Supp. 2d 317, 323 (S.D.N.Y. 2001).

**B.      Right to be Present**

Petitioner next seeks habeas relief on the ground that his absence from the first round of side bar conferences during jury selection denied him his right to be present during a critical stage of the proceedings. Habeas Pet. Ground 2. In particular, Persad argues that his absence violated his right under New York State law to be present at side bar conferences during jury selection. Pet. Mem. pp. 3-4.[8] *See People v. Antommarchi*, 590 N.Y.S.2d 33, 34-35 (1992).[9]

The *voir dire* began with the court introducing the defendant and the attorneys and providing the prospective jurors with a brief introduction to some criminal justice principles and a summary of the charges against Persad. Tr. 28-30. Additionally, the court informed the jury panel that the trial was expected to last a week and would not interfere with the upcoming Thanksgiving holiday, but that the selected jurors might be sequestered while they deliberated. Tr. 30-32. The court then asked the panel if it would be a hardship for anyone to serve and allowed each individual who responded to approach for a side bar conference with the court and counsel. Tr. 33. The court conducted side bar conferences with twenty-seven jurors who asked to be excused for various hardship reasons, including a lack of proficiency with the English

---

[8] "Pet. Mem." refers to the Memorandum and Legal Arguments in Support of Petition for a Writ of Habeas Corpus, Docket Entry 3.

[9] In *People v. Antommarchi*, 590 N.Y.S.2d 33, 34-35 (1992), the New York Court of Appeals held that a defendant has a limited right to be present at *voir dire* side bar conferences. The Court noted that if a trial court is exploring a potential juror's background and bias, a defendant must be present. *Id.* On the other hand, if a court is simply questioning a juror about physical impairments, family and work obligations, and similar personal hardships unrelated to a defendant's case, the defendant's presence is not required. *Id.*

language and medical appointments.[10]  Tr. 33-55.  The court excused twenty of the panel members for hardship reasons.  Of the seven potential jurors who were denied a hardship excuse, however, none were ultimately seated on the jury; rather, it appears that counsel exercised challenges against all of them.[11]

After the first round of side bar conferences, Persad executed a written *Antommarchi* waiver, surrendering his right to be present during side bar conferences.[12]  Tr. 86-87.  The Appellate Division concluded that Persad's absence during the first round of side bars was not a violation of *Antommarchi*, finding that petitioner "would not have been able to make any contribution to this process" in light of the fact that only one juror discussed matters other than scheduling or language difficulties, and she was excused for cause on consent of both attorneys.  *Persad*, 760 N.Y.S.2d at 673, 306 A.D.2d at 359.

------

[10] The transcript provided to the Court is missing page 54, which contains portions of the last two side bar conferences.  The Court's reading of the transcript suggests that the twenty-sixth potential juror, a Jehovah's Witness, tr. 53, was excused, because she does not appear further in the transcript.  The twenty-seventh potential juror, whose name does not appear in the pages of the transcript provided to the court, was not excused because the court was able to accommodate his or her religious dietary concerns.  Tr. 55.

[11] This conclusion is based on respondent's assertion, *see* Resp. Mem. p. 22, as well as on my own review of the transcript of the *voir dire* proceedings, *see* Tr. 39-43, 45-47 (identifying six jurors who were not excused after side bar conferences) and Tr. 172, 286, 289-92 (excusing these jurors after they were challenged peremptorily or for cause).

[12] There is a factual question with respect to the actual timing of the execution of the *Antommarchi* waiver.  The prosecution argues that Persad agreed to waive his right and signed the waiver before jury selection began but that the court did not place the waiver on the record until after the first round of side bar conferences.  Resp. Mem. p. 21.  In support of its argument, the prosecution notes that the court referred to the waiver as "the document you signed a little while ago."  Tr. 86-87.  In addition, Persad did not raise any objection when the court conducted the first round of side bar conferences.  Because Persad's claim lacks merit in any event, it is not necessary to determine precisely when his *Antommarchi* waiver occurred.

Federal habeas relief is available only for violations of federal constitutional rights. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991). Therefore, any violation of Persad's state-law *Antommarchi* right would not be a cognizable ground for habeas relief. Nonetheless, Persad's claim does raise a federal constitutional issue. A criminal defendant has the right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n.15, 95 S. Ct. 2525, 2533 (1975). *See also Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667 (1987). This right includes the right to be present generally for the impaneling of the jury and the pre-screening of potential jurors. *Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002); *Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir. 1998); *see also* FED. R. CRIM. P. 43(a). The right, however, is not absolute, and it is an open question whether it encompasses the right to be present at *voir dire* side bar conferences. *See Sanchez v. Duncan*, 282 F.3d 78, 83 fn.4 (2d Cir. 2002) (declining to decide whether there is a "clearly established" federal right to be present at *voir dire* side bar conferences); *Michaels v. Portuando*, 2002 WL 1732813 (E.D.N.Y. July 23, 2002) (holding that there is no clearly established right to be present at side bar conferences). Moreover, in *Cohen*, the Second Circuit distinguished between the "administrative empanelment process," which includes questioning jurors concerning personal hardships in serving, from "substantive inquiry into juror qualification," and held that a defendant has no right to be present for the former. 290 F.3d at 489.

In all but one of the side bar conferences in this case, the court examined hardship issues such as English language proficiency, hearing problems, and medical and family matters. The court's questioning went beyond mere "administrative empanelment" questions only with respect

to one juror. As discussed by the Appellate Division, the court asked one potential juror whether she could be fair and impartial in light of the fact that her daughter had been robbed at gunpoint at the store where she worked. Tr. 39-40. Thus, with respect to this particular juror, the voir dire did include a "substantive inquiry" into the juror's qualifications to serve.

As discussed above, the Supreme Court has not held that a defendant has a constitutional right to participate at side bars conducted during voir dire. Moreover, Persad's absence from the first round of questioning in this case did not "frustrate the fairness of the proceedings" in any way. None of the panel members in the first round were ultimately seated as jurors, and Persad's counsel was present at the side bar conferences, consented to the court's decisions to excuse various jurors, and fully participated in the proceedings. It is difficult to fathom how Persad's presence could have added anything to the jury empanelment process. "[T]here is no constitutional right to be present 'when presence would be useless, or the benefit but a shadow.'" *Cohen*, 290 F.3d at 489 (*quoting Snyder v. Massachusetts,* 291 U.S. 97, 106-07, 54 S. Ct. 330, 332 (1934)).

Petitioner's arguments to the contrary are completely lacking in merit. Persad argues that, had he been present, a woman of Indian nationality may have been retained "for the purpose of enhancing the defendant's misidentification defense." Pet. Mem. p. 4. It is not clear which potential juror petitioner is referencing, but a male juror from India and a female juror from Pakistan were excused for cause because of their inability to understand English. Tr. 36-37, 49. Because these prospective jurors were asked only "administrative empanelment" questions, Persad had no right to be present at the side bar. Moreover, even had he been present, Persad's participation almost certainly would not have changed the outcome; it seems inconceivable that

the court would not have excused these jurors, even over Persad's objection, in light of their language difficulties.

Petitioner also argues that "others, who were retained after the sidebars, may have later been stricken by the defense" based upon Persad's personal observations of their demeanor. Pet. Mem. p. 5. As noted above, however, all of the potential jurors who were not excused for hardship reasons were ultimately struck later in the proceedings. Clearly then, Persad's presence at the side bar conferences would not have changed the result. Finally, Persad did waive his right to participate at side bars at some early point in the jury selection process. Tr. 87. There is no reason to think that, had he been asked to do so earlier, he would have declined.

For all these reasons, I recommend that petitioner's second claim for habeas relief be denied.

## C. Prosecutorial Misconduct

Persad claims that the prosecutor's "inflammatory and improper" summation resulted in a due process violation and a fundamentally unfair trial. Habeas Pet. Ground 4. More specifically, Persad objects to the prosecutor's use of religious references on three separate occasions and to the prosecutor's alleged improper speculation.[13]

---

[13] Respondent argues that this claim, as well as petitioner's other remaining claims, are procedurally barred from federal review because the state court dismissed them on the merits on independent and adequate state law grounds. In petitioner's case, the Appellate Division specifically addressed only Persad's claims concerning his adjournment request and right to be present at side bar conferences, and concluded its decision with the statement that the "remaining contentions . . . are unpreserved for appellate review or without merit." When a state court uses such language, the claims are not deemed to be defaulted or barred but rather are subject to federal habeas review and, moreover, are entitled to "AEDPA deference." *Jiminez v. Walker*, 458 F.3d 130, 135-45 (2d Cir. 2006); *Fama v. Comm'r of Corr. Svcs.*, 235 F.3d 804, 810 (2d Cir. 2000).

Towards the beginning of his summation, the prosecutor used what he described as an "old saw or adage" that in fact has religious roots: "Only the guilty flee'th where the wicked do not pursue."[14]  Tr. 1042.  Defense counsel did not object.  Shortly thereafter, the prosecutor stated that "we're talking about laws that, . . ., some of them have their genesis or beginning way back in ancient times, going back to the Decalogue or the Ten Commandments, 'Thou shall not kill.'"  Tr. 1043.  Defense counsel objected and the court sustained the objection.  Tr. 1043.  Towards the end of his summation, the prosecutor said that "[t]his is not a homicide case, I say, by divine province, but be that as it may."  Tr. 1062.  Defense counsel objected but was overruled.  Tr. 1062.

Additionally, Persad objects to the following statements that respond to Persad's attack on the prosecution's witnesses.  First, the prosecutor said that "Mr. Persad here has an answer for everything, doesn't he.  And it makes you wonder if I had brought in five more people who had seen him running around Flushing with a gun that morning, whether they'd be part of a frame-up, too."  Tr. 1057.  Later, in a similar vein, the prosecutor commented that "it makes you wonder, indeed if I had brought forth more people if he'd have something to say about all of them."  Tr. 1069.  Defense counsel objected to both of these statements.  Tr. 1057, 1069.  The court sustained both objections and directed the jury to disregard the prosecutor's statements.  Tr. 1057, 1069.  Lastly, Persad objects to the prosecutor's paraphrasing of William Shakespeare's *Hamlet* when the prosecutor said that "[m]e thinks the man doth protest too much."  Tr. 1057.

A prosecutor's misconduct gives rise to a constitutional due process violation only when it "so infect[s] the trial with unfairness," *Donnelly v. DeChristofor*, 416 U.S. 637, 643, 94 S. Ct.

---

[14] According to Proverbs 28:1, the adage is "The wicked flee when no man pursueth. . . ."

1868, 1871 (1974), and is "of [such] significance to result in the denial of the defendant's right to a fair trial." *U.S. v. Agurs*, 427 U.S. 97, 108, 96 S. Ct. 2392, 2400 (1976). The prosecutor's misconduct must be "egregious," and not mere ordinary error, to constitute a denial of due process. *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) (*citing Donnelly*, 416 U.S. at 647-48, 94 S. Ct. at 1873). Moreover, a petitioner must show "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994). Factors to consider in determining whether "actual prejudice" exists include "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." *Floyd*, 907 F.2d at 355. *See also U.S. v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) ("[T]he existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal.")

The alleged misconduct here was of minor severity, consisting of six asserted transgressions in the course of a thirty-page summation. Moreover, the substance of the alleged errors was not significant. Although the majority of state and federal courts disapprove of the use of religious references during trials, the transgression here was not so egregious as to deny Persad a fair trial. *See*, *e.g.*, *People v. Johnson*, 3 A.D.3d 581, 770 N.Y.S.2d 659 (2d Dep't 2004) (recognizing that religious references during summation are improper); *State v. Ceballos*, 832 A.2d 14, 32-34 (Conn. 2003) (citing cases which have held that religious references during a summation are improper).

In *Ceballos*, for example, the Connecticut Supreme Court found it was error for the prosecutor to refer to the "possible divine consequences that await the defendant as a result of his actions" and to argue that defendant wanted the jury "to believe that pure evil, Satan's daughter, [the victim who testified,] appeared here." *Id*. at 35-37. Here, in contrast, the first challenged reference – to where the wicked flee – was described by the prosecutor as an old adage, and may not even have been recognized by the jurors as a passage from the bible. The other references – to the Ten Commandments and to Psyllos' survival being the result of "divine providence" – were made in passing and addressed to undisputed aspects of the case having nothing to do with Persad's misidentification defense.

The prosecutor's remarks here, considered in their entirety, are insufficient to violate due process. *See Brussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir. 1994) (finding that a reference to Proverbs 28:1 during summation was not improper because "[t]he prosecutor did not use the Bible to invoke the wrath of God against [defendant] or to suggest that the jury apply divine law as an alternative to the law of [the state]"). Moreover, the trial court sustained Persad's objection to the prosecutor's reference to the Ten Commandments. Finally, the prosecution's proof of Persad's guilt was very strong. The in-court identifications made by Psyllos and Kennedy were corroborated by Gonzalez's testimony that Persad had a gun with him on the night of the shooting and that Gonzalez heard a shot, turned, and saw Persad near a car that, like Kennedy's, was red; Errico's testimony that he saw Persad on the night of the shooting holding what he thought was a gun; and Detective Lilla's recounting of Persad's post-arrest statements confessing to the shooting.

Persad's challenge to the prosecutor's comments on his counsel's summation is equally

without merit.  First, the remarks were invited by defense counsel's closing argument, which forcefully challenged the credibility of prosecution witnesses Kennedy, Psyllos, Gonzalez and Lilla.  Tr. 1022-39.  "Where a substantial portion of the defense summation is devoted to attacks upon government witnesses . . . the prosecutor is entitled to make an appropriate response."  *U.S. v. Clark*, 613 F.2d 391, 405 (2d Cir. 1979).  *See also Hirsch v. Plescia*, 2005 WL 2038587, at *6-7 (E.D.N.Y. Aug. 23, 2005) (holding that even "comments made by the prosecutor that defense counsel was misleading the jury or distorting the facts were not overly inappropriate, considering that the prosecutor was responding to similar comments from defense counsel").

Second, even if the comments rose to the level of prosecutorial misconduct, petitioner's claim would fail, because he has not established resulting prejudice.  In fact, the court issued brief curative instructions twice.  Tr. 1057, 1069.  Moreover, the prosecutor's comments were not likely to have had a substantial effect on the jury's verdict both because the evidence of Persad's guilt was strong and because the remarks in question were isolated and not particularly inflammatory.  *Compare Tankleff*, 135 F.3d at 253 (finding that the prosecutor's misconduct, consisting of two statements, was "short and fleeting" and denying habeas relief) *with Floyd*, 907 F.2d at 353 (finding "repeated and escalating prosecutorial misconduct from initial to closing summation" warranted habeas relief).

For all these reasons, I recommend that this aspect of Persad's claim for habeas relief be denied.

## D.     Ineffective Assistance of Counsel

Next, petitioner claims that his trial counsel was ineffective.  Habeas Pet. Ground 6.
Persad asserts that trial counsel 1) failed to object to or prepare properly for the testimony of

Richard Errico, 2) elicited from one of the officers the fact that the victim, Psyllos, had identified Persad, 3) failed to object sufficiently during the prosecutor's summation, and 4) failed to object to a jury charge that improperly bolstered prosecution testimony. Pet. Mem. pp. 11-13.[15]

In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984), the Supreme Court established a two-prong test to evaluate ineffective assistance of counsel claims. Under *Strickland*, a petitioner must establish 1) that counsel was deficient; and 2) that the petitioner suffered prejudice as a result of the deficiency. *Id.* A criminal defendant must overcome a strong presumption that counsel's conduct was reasonable and constituted "sound trial strategy." *Id.* at 689, 104 S. Ct. at 2065. Moreover, even if counsel was deficient, under the second prong, relief is available only if the petitioner "show[s] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068. "It is not enough ... to show that the errors had some conceivable effect on the outcome" since virtually all of counsel's acts have some effect. *Id.* at 693, 104 S. Ct. at 2067.

With respect to the first claim, Persad alleges that trial counsel failed to "object to or prepare for the last minute testimony of Richard Errico, who, by providing improper 'prior bad act' evidence about the defendant, enabled the prosecution to argue a completely unsubstantiated, speculative, and unexpected 'revenge motive' for the assault." Habeas Pet. Ground 6; Pet. Mem. pp. 11-12. The prosecutor informed defense counsel and the court of his intention to call Errico on the morning of December 4, 2000. Tr. 842. Errico was unavailable to testify that day and was

---

[15] As noted above, petitioner has withdrawn other claims of ineffective assistance that he failed to exhaust in state court. *See* Docket Entry 15.

called the next morning.  Tr. 914.  Thus, counsel had overnight to prepare his cross-examination.  Defense counsel did not object to the timing of the prosecution's notice that Errico would testify or request additional time to prepare.  Tr. 842, 914.

Counsel's failure to object to the timing of the prosecutor's disclosure that Errico would testify was not ineffective.  First, it is far from clear that the prosecutor's statement on December 4 was the first indication that Errico would testify; the transcript also supports a reading that the prosecutor was informing the court and counsel simply that Errico would not be available to testify until the next day.  Tr. 842.  In any event, even one day's notice was ample time to prepare for Errico's testimony.  Errico's direct examination was short and straightforward, consisting of only nine pages.  Tr. 914-22.  No exhibits were shown to Errico during his examination.  Moreover, Persad's counsel effectively cross-examined Errico in questioning that took twice as many pages to record as Errico's direct.  Tr. 922-41.  Persad's counsel brought out that Errico, Psyllos and Kennedy were friends; that, despite claiming to have seen Persad with a gun on the night of the shooting, Errico did not call the police when he learned the next morning that Psyllos had been shot; and that Errico had a criminal record.  Tr. 934, 940.  Although Persad argues that the prosecutor used Errico's testimony that Persad had been beaten months before the shooting to suggest motive, that testimony was rendered fairly insignificant when Errico further acknowledged that neither Psyllos nor Kennedy were involved in the beating.  Tr. 920-21.  In any event, Persad offers no suggestion about how his counsel could have more effectively countered that testimony, even if he had been given greater advance notice that Errico would be a witness for the prosecution.  Finally, "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support

an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (*quoting U.S. v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987)).

Persad next claims that it was ineffective for counsel to elicit, during cross-examination of a police officer, that Psyllos had identified him as the shooter prior to trial.  Habeas Pet. Ground 6.  Although Persad does not identify the officer on whose testimony this claim is based, I presume Persad's claim is addressed to the testimony of Detective Lilla.  *See also* Resp. Mem. p. 44.  However, although Lilla testified on cross-examination that Psyllos had been shown a photo array, Persad's counsel carefully avoided asking him whether Psyllos identified any of the photographs as a picture of the man who shot him.  Tr. 874.  In any event, Psyllos had already described how he identified Persad from a photo array.  Tr. 759-60, 802-03.  Thus, no prejudice would have resulted even if Lilla had described Psyllos' identification of Persad.

Persad next contends that his trial counsel failed to object sufficiently during the prosecution's summation.  In fact, counsel raised six objections, three of which were sustained. Tr.  1043, 1057, 1059, 1062, 1069.  Moreover, objections, particularly during a prosecutor's summation, are generally considered strategic in nature and therefore not grounds for claims of ineffectiveness. *Franza v. Stinson*, 58 F. Supp. 2d 124, 148 (S.D.N.Y. 1999) (finding trial counsel's failure to object during summation to be a trial tactic and therefore not grounds for habeas relief); *Gatto v. Hoke*, 809 F. Supp. 1030, 1039 (E.D.N.Y. 1992) (same).

Persad's final claim of ineffective assistance is that counsel failed to object to a portion of the jury charge that improperly bolstered the prosecution's case.  Again, Persad has failed to identify, either in his petition or supporting memorandum of law, the aspect of the jury charge he claims was improper.  Having reviewed Persad's state court submissions, respondent infers that

his complaint has to do with the trial court's charge on identification testimony. However, as discussed in greater detail below, trial counsel did object to this aspect of the charge. Tr. 1135-36.

It is clear from the record as a whole that defense counsel acted competently throughout the entire trial. The deficiencies alleged by Persad, to the extent they occurred, fail to overcome the strong presumption of reasonableness and "sound trial strategy" required by *Strickland*. I therefore respectfully recommend that petitioner's claim of ineffective assistance of trial counsel be denied.

## E.     Right to Present a Defense

Lastly, petitioner asserts that the trial court improperly deprived him of his rights to due process and a fair trial because the trial court placed an "undue restriction" on the presentation of his defense. Habeas Pet. Ground 3. In this regard, Persad claims that the trial court: 1) improperly precluded cross-examination of an officer concerning the victim's statement that he had never seen the shooter prior to the incident and 2) failed to instruct the jury that it could consider two witnesses' failures to identify Persad from photo arrays they viewed shortly after the shooting. Persad argues that these alleged errors rise to the level of a constitutional deprivation of his right to present a defense because the "heart of petitioner's defense at trial was misidentification." Pet. Mem. p. 5.

### 1.     *Cross-Examination of Detective Meenan*

In presenting his defense, Persad called Detective Michael Meenan to testify. Tr. 902 *et seq.* Detective Meenan interviewed Christopher Psyllos, the victim, on April 16, 1999, the day of the shooting, while Psyllos was still at the hospital. Tr. 903. During his direct examination of

Meenan, defense counsel asked, "And in the course of that interview, did [Psyllos] tell you that he had never seen the shooter before that date?" Tr. 904. The prosecutor objected on hearsay grounds, and the court sustained the objection. *Id.* Later, defense counsel asked, "Without stating any of the details of the conversation, did Mr. Psyllos, at that initial interview, give you details regarding the shooter?" Tr. 905. The prosecutor again objected on hearsay grounds. *Id.* The court overruled the objection and asked the detective if he was able to learn any details. *Id.* Meenan answered "yes." *Id.* Defense Counsel did not further pursue this particular line of questioning, but instead began asking about the detective's interview with Psyllos on May 3, 1999, and in particular whether Psyllos identified Persad from a photo array that was shown to him on that date. Tr. 905-06. The prosecutor objected, the court ovverruled the objection, and Meenan answered no. *Id.* Meenan's complete testimony lasted only eight pages. Tr. 902-10.

The Supreme Court has held that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense" at trial. *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146 (1986) (*citing California v. Trombetta*, 467 U.S. 479, 485 104 S. Ct. 2528, 2532 (1984)). Nonetheless, trial court judges are granted "wide latitude" when making evidentiary rulings, and federal reviewing courts are "reluctan[t] to impose constitutional constraints on ordinary evidentiary rulings by state trial courts. *Id.* at 689, 106 S. Ct. at 2146.

The question on habeas review is whether the court's evidentiary ruling was "contrary to" or an unreasonable application of clearly established federal law. With respect to rulings on evidence, clearly established federal law dictates only that "a court may not arbitrarily and irrationally apply evidentiary rules in a mechanical fashion to exclude material, reliable, exculpatory evidence." *Morales v. Smith*, 2005 WL 2367621, at *6 (E.D.N.Y. Sept. 27, 2005).

*See also Wade v. Montello*, 333 F.3d 51, 57-58 (2d Cir. 2003); *Roberts v. Scully*, 875 F. Supp. 182, 189 (S.D.N.Y. 1995) ("[R]ulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue.").

The only testimony precluded by the trial judge concerned whether Psyllos told Meenan that he had never seen the shooter before April 16, 1999. Persad has identified no hearsay exception that would have permitted Meenan to testify to Psyllos' out-of-court statement as substantive evidence. While the testimony might arguably have been received for impeachment purposes, Psyllos had already testified – in response to questioning by Persad's counsel on cross-examination – that he had been shown a photo spread in May of 1999 but did not identify any of the photographs in it, and that he did not tell the detectives who showed him the spread that he had seen his assailant before the shooting. Tr. 790-91. Meenan's hearsay account of his interview with Psyllos would therefore not have been inconsistent with Psyllos' own testimony. Accordingly, the trial court's evidentiary ruling was neither arbitrary or irrational, and did not deprive Persad of his constitutional right to present a defense.

   2.    *Jury Instruction*

Perhaps Persad's most compelling basis for relief is his challenge to the trial judge's marshaling of the identification evidence during the jury charge. Persad contends that the judge's charge was biased in favor of the prosecution.

As discussed above, both Psyllos and Kennedy were shown photo arrays shortly after the shooting, and neither identified Persad as the perpetrator. Months later, Psyllos was again shown a photo array, and on this occasion did identify Persad as the shooter. Psyllos and Kennedy both identified Persad as the shooter at trial.

The court's instruction to the jury on the issue of identification recounted the evidence that Psyllos had previously identified Persad from a photo array and that Psyllos and Kennedy identified Persad as the shooter during the trial. Tr. 1106. The court did not, however, refer to the evidence that both Psyllos and Kennedy failed to identify Persad from the photo arrays they viewed shortly after the shooting. Put simply, the court reminded the jury of the identification evidence that was incriminating without mentioning that which was exculpatory. Nevertheless, I must consider Persad's challenge mindful that a state prisoner making a claim of improper jury instructions faces a very substantial burden. *DelValle v. Armstrong*, 306 F.3d 1197, 1200 (2d Cir. 2002).

Errors with respect to state jury instructions are generally not grounds for federal habeas relief, even when asserted as a violation of the right to present a defense. *See Gilmore v. Taylor*, 508 U.S. 333, 343-44, 113 S. Ct. 2112, 2118-19 (1993); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Rather, an erroneous jury charge may give rise to habeas relief only if the error results in depriving a defendant of a federal constitutional right:

> Before a federal court may overturn a conviction resulting from a state trial in which [an inadequate] instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

*Cupp v. Naughten*, 414 U.S. 141, 146, 94 S. Ct. 396, 400 (1973). Even if an error in the charge implicates a constitutional right, habeas relief may be granted only if "the ailing instruction by

itself so infected the entire trial that the resulting conviction violates due process." *Id*. at 147, 94

S. Ct. at 400. In addressing this question, "the challenged instruction 'may not be judged in

artificial isolation,' but must be considered in the context of the instructions as a whole and the

trial record." *Estelle*, 502 U.S. at 72, 112 S. Ct. at 482 (*quoting Cupp*, 414 U.S. at 147, 94 S. Ct.

at 400-01). *See also Gaines v. Kelly*, 202 F.3d 598, 606 (2d Cir. 2000); *Copeland v. Walker*, 258

F. Supp. 2d 105, 138 (E.D.N.Y. 2003). I therefore consider the court's identification charge in

its entirety and then analyze its impact on the fairness of Persad's trial.

During the charge conference, defense counsel, pointing out that Persad's defense hinged

on misidentification, requested a "very detailed charge on the principle of identification." Tr.

1003. Specifically, counsel requested a "*Daniels*" charge, "where the jury is fully instructed

about all of the circumstances that they should consider in determining whether or not the

defendant has been correctly and reliably identified."[16] Tr. 1003. The court's only response was

that it would give a "thorough charge on identification." Tr. 1004. No details as to how the

court specifically planned to instruct the jury were discussed.

---

[16] Counsel's reference to a "*Daniels*" charge apparently refers to the case of *People v. Daniels*, 88 A.D.2d 392 (2d Dep't 1982), which discusses what ultimately came to be the New York Criminal Jury Instruction on identification. The "*Daniels*" charge and New York Criminal Jury Instruction, however, focus on the factors a jury should consider in determining the credibility and reliability of a witness' identification. The charge, unlike the federal instructions, does not specifically include reference to situations where there have been disparate identifications. *Daniels*, however, does suggest that a court should note in particular whether any description of the perpetrator matches or does not match the defendant on trial. 88 A.D.2d at 401, fn.1. By extension therefore, a court should also note whether there were any misidentifications or nonidentifications of a defendant in photo arrays or lineups. Moreover, the *Daniels* court stated that "given the contradictory nature of the eyewitness testimony, [the trial court] should have charged that in weighing the evidence on the issue of identification, the jury should focus on accuracy as well as veracity, weighing all the facts and circumstances surrounding the giving of two different descriptions." *Id*. at 400-01.

The trial court did in fact provide the jury with detailed instructions about how to evaluate the identification evidence they heard. The court began by properly noting the jury's role and emphasizing the prosecution's burden of proof:

> As you have become aware, . . . a main issue in this trial is the identification of the defendant . . . as the person who committed the crimes charged in the indictment. . . . As I have instructed you, the People have the burden to prove to your satisfaction, beyond a reasonable doubt, not only all of the essential elements of the crimes as I instructed you, but also that the defendant . . . is the person who committed them.
>
> You, the jury, are the sole judges of the rightness, indeed, the certainty of the identification. You must therefore examine with great care all of the evidence on the issue of identity. And as you have been instructed, you must be convinced beyond a reasonable doubt that the defendant is the right man, the man who, in fact, committed these crimes or you must acquit him.

Tr. 1106-07. Next, the court discussed the identification evidence proffered by the government in Persad's case, highlighting the testimony of Psyllos and Kennedy positively identifying Persad as the shooter, and the positive identification by Psyllos from the photo array:

> In this case, a part of the evidence which was offered to establish that the defendant Persad is the right man, the actual perpetrator of the crime, was the testimony of witnesses Christopher Psyllos and Thomas Kennedy. They testified that . . . Persad is the person who committed the crime.
>
> Mr. Psyllos testified that on a previous occasion, at a photographic array showing, he identified a person, who Detective Lilla testified is this defendant, as the person who committed the crime.
>
> In addition to Mr. Psyllos and Mr. Kennedy's testimony, the People have offered other evidence, which other evidence they contend also tends to establish that Mr. Persad is the actual perpetrator.

Tr. 1106. The court then mentioned Gonzalez, Errico, and Lilla, but did not describe their

testimony or discuss how it corroborated the Psyllos and Kennedy identifications.  The court again reminded the jurors to "consider all the evidence you have heard on [the identification] issue from whatever source." Tr. 1106-07.  The court also cautioned the jurors to "examine with care" the testimony of Psyllos and Kennedy, including consideration of their opportunity to observe the perpetrator and evaluation of their memory and credibility.  Tr. 1107.

After reminding the jurors that the government had the burden to prove beyond a reasonable doubt that Persad committed the offenses, the court specifically noted for a second time the identification by Psyllos from a photo array:

> You will recall that the witness, Christopher Psyllos, testified that after the crime he saw and identified the defendant by a photo array exhibited to him on January 13, 2000, at his home.  The evidence is that the crime charged was committed on April 16, 1999.  This trial is now being held almost 18 months after the crime was committed.  It is therefore relevant to establish that nine months after the commission of the crime, while the witness' memory was perhaps fresher than at the present, Mr. Psyllos picked out and identified this defendant as the perpetrator of the crime at a photo array.
>
> Such prior identification of the defendant Persad as the perpetrator may be considered by you together with all of the other relevant evidence, from whatever source, on identification in the case in evaluating the accuracy of the witness' identification here in Court of this defendant as the perpetrator of the crime charged.
>
> I instruct you that the witness' prior identification of the defendant by photo should nevertheless be scrutinized by you with care.

Tr. 1108-09.

Finally, the court addressed Persad's defense of misidentification, but without making any reference to the failures by Kennedy and Psyllos to identify Persad from the photo arrays they were shown shortly after the shooting:

[T]he defendant contends that the witness, Mr. Psyllos, was mistaken when he identified him as the perpetrator by means of a photo array, and because of that previous mistake, he is now identifying here in Court not the actual perpetrator, but the defendant he mistakenly identified by the photo array exhibited to him by the police.

In other words, the defendant contends that the wrong man is now on trial before you in this Court because Mr. Psyllos made a mistake when he previously identified him as the perpetrator in the photo array.

Tr. 1109-10.

After the charge, defense counsel objected to the identification instruction, arguing that the court "instructed the jury that there had been prior identification evidence that specifically focused on Mr. Psyllos' identification of the defendant's photo . . . . The Court did not, however, remind the jurors that Mr. Psyllos had failed to identify the defendant's photo in the same array on May 3, of 1999." Tr. 1135. Defense counsel also noted that the court did not remind the jury about Kennedy's failure to identify Persad when shown the same photo array on the day of the shooting. Tr. 1135-36. Counsel then made an "urgent request . . . that the Court . . . instruct the jury that these are additional items of evidence that they should consider." The trial court denied defense counsel's application, stating that the charge, "in several places, calls the jury's attention to look at all evidence relating to identification and it's their recollection of the evidence that counts and that evidence was brought out before the jury, and I trust that they will recall that evidence in reaching their verdict." Tr. 1136.

The trial court's marshaling of the identification evidence favorable to the prosecution, while failing to mention the evidence favoring the defense, was unbalanced. This violated clearly established federal law determined by the United States Supreme Court. 28 U.S.C.

§ 2254(d). The Supreme Court has held that a trial judge's references to or comments on the

evidence must not be one-sided.[17]

> Justice and the law demanded that, so far as reference was made to the evidence, that which was favorable to the accused should not be excluded. His guilt or innocence turned on a narrow hinge, and great caution should have been used not to complicate and confuse the issue. But the charge . . . ignored the evidence [that favored the defendant].

*Allison v. U.S.*, 160 U.S. 203, 212, 16 S. Ct. 252, 256 (1895).

> Th[e] privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, . . . . He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, *and especially that it should not be one-sided*'. . . .

*Quercia v. U.S.*, 289 U.S. 466, 470, 53 S. Ct. 698, 699 (1933) (emphasis added) (citations

omitted). This precedent establishes that a defendant's constitutional due process right to a fair

trial encompasses a right to a balanced and accurate jury charge. *See also Oppenheim v. U.S.*,

241 F. 625, 629 (2d Cir. 1917) ("The words of the judge's charge are the last words and the most

weighty words that are dropped into the minds of the jury before they come to their verdict, and it

is of the utmost importance that they should be calm and impartial.") (reversing a conviction

---

[17] Pursuant to New York law, a trial court judge must charge the jury by "stat[ing] the material legal principles applicable to the particular case, . . . but it need not marshal or refer to the evidence to any greater extent than is necessary for such explanation." N.Y. CRIM. PROC. LAW § 300.10(2).

after finding that the trial court's charge was a "detailed argument on behalf of the government, making almost no reference to the claims of the defense"); *Manning v. Walker*, 2001 WL 25637, at *10 (E.D.N.Y. Jan. 3, 2001) ("Although a trial court has 'broad discretion' in determining which facts to include in its charge, it 'is circumscribed by the requirement that the charge be fair to both sides.") (*quoting U.S. v. Allen*, 127 F.3d 260, 264-65 (2d Cir. 1997)).  The unbalanced instruction in Persad's case, which emphasized the government's identification evidence and made no reference to the evidence favoring the defense, thus violated clearly established federal law.

Nevertheless, I conclude that the trial judge's biased marshaling of the evidence, when considered in the context of the entire charge and trial record, did not so "infect the entire trial" that Persad's conviction violates due process.[18]  I reach this conclusion for the following reasons.

First, the identification charge was otherwise proper, and emphasized the prosecution's burden to prove the identity of the shooter beyond a reasonable doubt.  The court also stressed that responsibility for evaluating the strength of the identification evidence rested solely with the jury, and cautioned the jurors to examine all of the relevant proof with great care.  *See Murden v. Artuz*, 253 F. Supp. 2d 376, 388 (E.D.N.Y. 2001) (denying habeas petition even where "the

---

[18] Some courts, after concluding that an erroneous jury instruction implicates constitutional rights, separately consider whether any resulting error was harmless under *Brecht v. Abramson*, 507 U.S. 619, 113 S. Ct. 1710 (1993).  *See, e.g., Mejias v. Allard*, 2006 WL 119033, at *14 (E.D.N.Y. Jan. 13, 2006).  An error is harmless unless it resulted in "actual prejudice," that is, unless it "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637, 113 S. Ct. at 1722 (*quoting Kotteakos v. U.S.*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).  *See also Fry v. Pliler*, __ U.S. __, 127 S. Ct. 2321, 2328 (2007).  There seems to be little to distinguish harmless error analysis from consideration of whether an ailing instruction, considered in the context of the entire charge and trial record, so infected a trial as to violate due process.  I therefore do not separately analyze whether the erroneous biased marshaling of identification evidence at issue here was harmless.

identification instruction could have been more balanced," because the trial court stressed the jurors' role as sole finders of fact and the prosecution's burden to establish identity beyond a reasonable doubt).

Second, although the trial judge made no mention of it, the evidence that Psyllos and Kennedy failed to identify Persad when first shown a photo spread was a central theme of defense counsel's summation. Tr. 1022-29. The inferences to be drawn from this evidence were plain, and explained in great detail by Persad's counsel. It therefore seems highly unlikely that the jury failed to consider the evidence, or to evaluate the inferences it might support, simply because the trial judge did not refer to it in his charge.

Third, the evidence of Persad's guilt was compelling. As discussed above, Gonzalez and Errico provided strong corroboration of the identifications made by Psyllos and Kennedy. Moreover, Persad fled the jurisdiction upon learning the police sought to question him, and made a post-arrest statement in which he confessed to the crime. Under these circumstances, the unbalanced marshaling of the evidence by the court did not infect Persad's trial or deprive him of due process.

Finally, other courts have rejected similar claims of unbalanced marshaling of identification evidence. *See Julien v. Hendricks*, 2005 WL 2290287, at *12-14 (D.N.J. Sept. 20, 2005) (denying habeas relief where jury charge referenced eyewitness' positive identification from photo spread but made no mention of same witness' failure to identify the defendant during trial); *Manning*, 2001 WL 25637, at *10-13 (denying habeas relief and finding that the trial court's charge in its entirety "effectively presented" petitioner's alternate defenses of mistaken and intentional misidentification); *Brown v. Edwards*, 1998 WL 1286349, at *9-10 (S.D.N.Y.

Jan. 15, 1998) (dismissing habeas petition where jury charge referred to witness' lineup identification but not to same witness' failure to identify petitioner when reviewing photographs). Accordingly, this aspect of Persad's petition should be rejected as well.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Persad's petition for a writ of habeas corpus be denied. Any objections to the recommendations made in this Report must be filed within ten days of this Report and Recommendation and, in any event, on or before August 15, 2007. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

_____
/s/
**Steven M. Gold**
**United States Magistrate Judge**

**July 31, 2007**
**Brooklyn, New York**

*U:\eoc 2007\persad habeas\final.wpd*